UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

DERRICK DEWAYNE GRANT #131548          CIVIL ACTION NO. 16-cv-0077

VERSUS                                 JUDGE FOOTE

N. BURL CAIN                           MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

### Introduction

A Caddo Parish jury voted 11-1 to convict Derrick Dewayne Grant ("Petitioner") of attempted second-degree murder. Petitioner was adjudicated a fourth felony offender and received a mandatory life sentence. His conviction was affirmed on direct appeal. State v. Grant, 105 So.3d 81 (La. App. 2d Cir. 2012), writ denied, 110 So.3d 1073 (La. 2013). Petitioner also pursued a post-conviction application in the state courts. He now seeks federal habeas corpus relief on several grounds. For the reasons that follow, it is recommended that his petition be denied.

### Background Facts

Michael Parker, Tawon Parker, and Matthew Parker were playing dominoes on the front porch of a house on East 71st Street in Shreveport one day in October 2003 when an SUV stopped in front of the house. Two men armed with rifles exited the passenger side of the SUV and opened fire at the men on the porch. Michael Parker was shot four times, twice in the side and once in each leg. He survived. The other two men were not injured.

Scott Marler, an off-duty Shreveport Fire Department driver, was driving east on East 70th Street near Thornhill when he heard loud popping noises and saw a tan SUV parked at the intersection of Thornhill and East 71st Street. Both doors on the passenger side of the SUV were open, and two men were standing outside and firing what appeared to be semi-automatic rifles at a house. Marler turned around and followed the SUV when it left the scene. He called 911 to report the shooting and provide the SUV's license plate number. A Shreveport police officer approached as the vehicles traveled on I-49 southbound. Marler pointed out the SUV to the officer, who then took over the pursuit.

The SUV traveled at a high rate of speed and exited I-49 onto the westbound Highway 3132 ramp. A backseat passenger in the SUV, later identified as Petitioner, leaned out and pointed a rifle at the police car. The officer heard a loud popping noise and saw something hit his windshield, but he did not stop his pursuit. He never lost sight of the SUV, and he clearly saw three black males inside.

The driver of the SUV eventually stopped in a ditch on West 78th Street, and the three men ran. The pursuing officer testified that all three men were armed with rifles. They fled through a thicket of bamboo and over a fence that had razor wire on the top. Other officers soon arrived and formed a perimeter. A search involving a K-9 unit began.

The K-9 tracked the scent of the men to a house on West 79th Street, under which officers found a rifle. The K-9 then alerted more strongly to another house on the same street, where the three black males were located. Another rifle was found under that house.

The officers conducted a knock and talk at the house. They encountered Petitioner, along with William Hall and Ira Ross. Petitioner had a fresh cut on his face. He said the

house belonged to his girlfriend, but he gave permission for the officers to conduct a protective sweep of the home.  The sweep revealed muddy clothes and tennis shoes, some of which were in the washing machine.  The three men were arrested, charged with attempted second-degree murder, and tried separately.  William Hall struck a plea bargain for a 15-year sentence and agreed to testify for the prosecution.  He testified that he was the driver, while Petitioner and Ross carried out the shooting.  He said the shooting was in retaliation for Tawon Parker having robbed Ira Ross of his drugs, while Ross was working in Petitioner's drug house.

LaSonya Hailey, Petitioner's girlfriend, testified that she had rented the SUV a few days before the shooting so that she could go to Texas and visit with family.  Ira Ross had borrowed the SUV on the date of the incident, and he left without Petitioner, who was in bed asleep.  Ms. Hailey said she gave Petitioner the gash over his eye in a fight they had a day or two prior to the shooting.

Petitioner, an admitted drug dealer, testified that he gave Ms. Hailey money to rent the SUV so they could travel to Texas to buy rims and antique furniture.  He denied involvement in the shooting and said the shooters were Ira Ross, William Hall, and Jackie Sanders.  Sanders had since died.  Petitioner said that Hall and Ross showed up at Ms. Hailey's house on the day of the incident and asked to come in.  They immediately started asking each other what happened to Jackie Sanders.  The men indicated they were running from the police.  Petitioner took their muddy clothes, put them in the washing machine, and gave the men clean clothes.  He said that Hall told him not to let the police in, but Petitioner did so when they arrived.

Richard Beighley, a firearms expert from the crime lab, examined the two rifles and materials recovered at the scene.  Thirteen fired casings and one live round with a primer print found at the scene were matched to one of the rifles.  Seven fired casings of a different caliber were recovered at the scene.  They were consistent with having been fired from the other rifle, but there were not enough markings to make a positive match.  The jury considered the evidence and returned a verdict of guilty to attempted second-degree murder.

**Habeas Burden**

All of Petitioner's habeas claims were decided on the merits in the state courts, either on appeal or post-conviction.  Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent when it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts.  Pape v. Thaler, 645 F.3d 281, 287 (5th Cir. 2011).  A state court makes an unreasonable application of clearly established federal law when it identifies the correct governing legal principle from the Supreme Court's decisions but applies it to the facts in a way that is not only incorrect but objectively unreasonable.  Renico v. Lett, 130

S.Ct. 1855, 1862 (2010).  When a state court has denied a claim on the merits, the AEDPA bars habeas relief unless the prisoner shows that the state court "erred so transparently that no fairminded jurist could agree with that court's decision."  Bobby v. Dixon, 132 S.Ct. 26, 27 (2011) (per curiam).

## Batson Challenge

ADAs Lea Hall and Dhu Thompson prosecuted the case, and Larry English served as defense counsel.  Judge Roy Brun presided.  The jury of twelve that was seated after the exercise of peremptory strikes included three African-Americans, and one of the alternates was African-American.  Mr. English raised a challenge under Batson v. Kentucky, 106 S.Ct. 1712 (1986) because the State exercised eleven peremptory strikes against African-American jurors.  The prosecutor responded to the Batson challenge by noting that the prosecution "still had strikes left to go" but did not use them to eliminate African-Americans from the jury.  The State also raised a Batson challenge against the defense because Mr. English had used all but one or two of his strikes to eliminate white jurors. Tr. 532-33.

Batson provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race: First, a party must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the striking attorney must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the challenger has shown purposeful discrimination.  Snyder v. Louisiana, 128 S. Ct. 1203, 1207 (2008).

The judge made an implied finding that both sides satisfied the prima facie showing of discriminatory strikes, saying, "I'm going to rule that we proceed to the second level of inquiry on both." He called for counsel to provide race-neutral explanations for the strikes. Petitioner challenged on appeal and in his habeas petition the explanations that the State offered for five of the prospective jurors.

The first juror at issue is Brandi Hunter. ADA Hall offered this explanation for striking her:

> Ms. Hunter was evasive during my questioning of her. She would not make eye contact with me and her body language and posture was such that I felt like she would not be a good juror for the case based on how she perceived me.

Tr. 535. The next juror at issue is Lekisha Cason. ADA Hall explained:

> Ms. Lakisha Cason had the same sort of issues that Ms. Hunter did. It was based on personal rapport between -- this panel was actually Mr. Thompson's but her approaches to Mr. Thompson seemed that such that -- also taken in connection with her responses to Mr. English, it seemed that she appeared to favor Mr. English over us and that's why she was cut.

Tr. 536.

ADA Hall offered with respect to Felicia Smith: "With respect to Ms. Smith, that also was just a general -- what her responses in total seemed to imply to us versus her responses to Mr. English." Tr. 536. Hall said that Daniel Francis was struck because "his cousin was convicted of armed robbery and Mr. Thompson and I were not sure whether we had actually convicted his cousin, whether that gave him any long-lasting hatred or resentment towards the State and I did that panel, I simply forgot to ask him." Hall added, "I had a strike left over and I was unsure and I exercised it." Tr. 538.

The final juror at issue was Mr. Louis Bonner, Jr.  Mr. Bonner stated during voir dire that ADA Hall "prosecuted someone that ran over my brother."  Tr. 459.  The judge later asked for a bench conference with Mr. Bonner and counsel, but it was not transcribed. Tr. 499.  ADA Hall, when called on to explain why Mr. Bonner was the subject of a strike, explained that the case mentioned by Mr. Bonner involved the homicide of his brother. The defendant in that case was the nephew of a politically connected person, and the prosecutor stated that he believed that person exercised influence over the case and that Mr. Bonner was aware of it.  He said that Mr. Bonner had been very candid, but "he made a statement at the bench that he had a problem with how he was treated."  The ADA agreed that Mr. Bonner had been "treated very horribly by the court in my opinion" so the ADA was "simply unsure how that was going to come out."  Tr. 536-37.

After the State offered its race-neutral reasons, Mr. English stated that he wanted to begin to offer the reasons for his strikes.  This exchange then occurred:

> The Court:    I'm not asking you at this point to defend the reverse <u>Batson</u>,
> I'm just asking if you have any more --
>
> Mr. English:  No, that's all, your honor.
>
> The Court:    Ok.  The court denies the <u>Batson</u>.
>
> Mr. English:  Ok.

Tr. 539.  Mr.  English then offered his explanations for his strikes. They included representations that he "perceived with them there was going to be an unfair advantage" because when he questioned the juror, he "did not get that same kind of feel."  Or "I saw on their face. . . a reluctance to follow, even though they eventually agreed with me."  He

said with respect to another juror that he "was uncomfortable with how they were responding when I asked them about the questions concerning the police and that caused me some concern about them." Another juror was struck because "they seemed to have established a rapport with the DA" when answering his questions, "and I didn't sense that same fairness as -- when I was asking them questions." Tr. 541-42. The court also denied the prosecution's Batson challenge. Tr. 543.

At step three of the Batson procedure, the trial court must evaluate whether the prosecutor's demeanor belies a discriminatory intent, and whether the juror's demeanor exhibited the basis for the strike articulated by the prosecutor. The best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge. And the "race-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention), making the trial court's firsthand observations of even greater importance." Snyder, 128 S.Ct. at 1208. For these reasons, a trial court's ruling on the issue of discriminatory intent must be sustained on appeal unless it is clearly erroneous. Snyder, citing Hernandez v. New York, 111 S.Ct. 1859 (1991). The Supreme Court has said that it will defer to the trial court on such findings "in the absence of exceptional circumstances." Snyder, quoting Hernandez, 111 S.Ct. at 1870.

The state appellate court addressed the same Batson challenges that Petitioner now presents in his habeas petition. The court set forth the three-step process and reviewed the explanations, as discussed above. It reasoned that although Petitioner might believe that the explanations for striking jurors Hunter, Cason, and Smith were too general or

unsatisfactory, "the trial court was present to witness the demeanor of each juror while she answered the questions of the attorneys" and "found the explanation for striking each of those jurors to be plausible, and found no discriminatory intent." The reasons given for jurors Bonner and Francis were found to be "even more compelling." Prosecutors were concerned that they might have personally prosecuted Mr. Francis' relative, which is a race-neutral reason, and they were concerned about Mr. Bonner's feelings given the proceedings in the prosecution of his brother's killer. Considering the deference due to trial court's evaluations, the appellate court found no grounds to reverse the trial court's decision to deny the Batson challenges. State v. Grant, 105 So.3d at 85-86.

On direct appeal, a trial judge's findings on Batson issues may be reversed only if the trial judge is shown to have committed clear error. But this case is not on direct appeal. It is a habeas petition, so "even more must be shown." Davis v. Ayala, 135 S.Ct. 2187, 2199 (2015). "A federal habeas court must accept a state-court finding unless it was based on 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Id., citing 28 USC § 2254(d)(2). "State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" Id. at 2199-2200, citing Rice v. Collins, 126 S.Ct. 969 (2006) and § 2254(e)(1). "The role of a federal habeas court is to guard against extreme malfunctions in the state criminal justice systems, not to apply de novo review of factual findings and to substitute its own opinions for the determination made on the scene by the trial judge." Davis, 135 S.Ct. at 2202 (cleaned up).

Petitioner argues that none of the challenged jurors made any statements in their voir dire that objectively rendered them poor prospects, but objective articulable grounds are not required to validate the exercise of a peremptory strike. Strikes are often used based on the instinct of counsel after observing demeanor, body language, tone, and other factors that do not appear on the cold record. That is why such deference is afforded the trial judge's assessment of these issues. The judge in this case made a reasonable decision, and the state appellate court reasonably applied the <u>Batson</u> principles to affirm that decision. This court cannot say that the state court findings were unreasonable in light of the evidence presented, particularly in light of the presumption of correctness and the burden on Petitioner to rebut that presumption. This is not one of the extreme malfunctions in the state system that allows for habeas relief. Accordingly, the petition should be denied with respect to this claim.

Petitioner also complained on direct appeal that the bench conversation with Mr. Bonner was not transcribed so could not be reviewed. The state appellate court pointed out that the transcribed remarks by the prosecutor and judge made it apparent that Mr. Bonner informed the court that his brother had been murdered and that Mr. Bonner was unhappy with how he was treated during the related proceedings. The failure to record the actual bench conference was deemed to not prejudice the appeal because the transcript of the voir dire revealed a substantial basis for challenging the juror. Petitioner makes the same argument in his habeas petition, but he cites no clearly established Supreme Court precedent or other basis that would allow habeas relief on this issue under 28 U.S.C. §2254(d). Furthermore, the undersigned has held that habeas relief is not allowed for

failure to provide a full transcript of bench conferences absent a showing of actual prejudice.  Hedgespeth v. Warden, 2015 WL 1089325 (W.D. La. 2015).

Petitioner also argues that the strike of Mr. Francis, based on his alleged involvement in criminal proceedings, was improper because the prosecution did not strike white jurors who mentioned that they or family had been charged with crimes.  The distinction, however, is that the prosecutors were concerned that they may have personally prosecuted Mr. Francis' cousin for armed robbery.  The challenge was not simply based on Mr. Francis having a cousin who had experienced criminal troubles.  To the extent Petitioner contends the trial court was required to conduct a comparative juror analysis, the Fifth Circuit has held that the Supreme Court has not clearly established any requirement that a state court conduct a comparative juror analysis, let alone *sua sponte*.  Chamberlin v. Fisher, 885 F.3d 832, 838 (5th Cir. 2018).

**Comment on Post-Arrest Silence**

William Hall testified for the State.  He admitted that he drove the SUV, and he said Petitioner was one of the shooters.  Petitioner chose to testify and offer his version of the events.  Petitioner admitted that he had prior drug convictions and was a full-time dealer of marijuana and cocaine, but he denied that he was involved in the shooting.  Petitioner testified that he was home watching television when he heard someone yelling at his back door.  It was William Hall and Ira Ross, and William was asking Ira, "Where is little Jackie?"  Petitioner said that Little Jackie was Jackie Sanders, the third person involved in the shooting.

The men told Petitioner that the police were after them, and they asked Petitioner to not let the officers in the house. About five minutes after they arrived, the men told Petitioner what had happened. Petitioner admitted that he helped the men wash their clothes and discuss a plan. He said he told them that all he could do was give them some clothing, and they were on their own. Petitioner soon saw the police outside, and he told the officers they could come in and search. When defense counsel asked why he consented, Petitioner said, "Because I just, I mean --, I mean, how can you not tell the police?" The officers took the men outside, searched the house, and then arrested all three. Tr. 794-99, 807.

Jackie Sanders, who Petitioner said was the third man involved, died in jail about three months after the incident. Tr. 809. On cross-examination, the prosecutor asked why Petitioner did not bring up Sanders earlier.

> Q.   And with respect to this Jackie Sanders stuff going on, all that, the first time we're hearing about it is here at your trial, right?
> A.   Yes, sir.
> Q.   Okay. And I believe you said that, "How can you not tell the police" – you know, talking about when they're coming in. "How can you not tell them what's going on" in response to one of your questions to Mr. English; do you recall saying that?
> A.   Yes, sir.
> Q.   Well, how come you didn't tell the police about Jackie Sanders and all that at the time?
> A.   Because I hadn't actually laid eyes on Jackie Sanders. I mean, I wasn't going to tell the police that, "Hey, you got another guy next door."
> Q.   Well, you didn't tell the police anything, did you?
> A.   No, sir. All I told them is that they can search the house.

Tr. 815-816. A police officer was asked about whether the defendants were advised of their Miranda rights. He said that the men were first placed on the front porch of the house

before the officers performed a safety sweep.  After the officers found evidence inside the house, he went to the front porch along with another officer and advised all three of their <u>Miranda</u> rights.  Tr. 664.

The prosecutor's closing rebuttal argument returned to the issue.  ADA Hall argued that Petitioner was not the cooperative person he suggested in his testimony.  He argued:

> "Who in the world would be most interested in getting to the bottom of it? An innocent man. An innocent man would stand before the police and go, "Look, I didn't have anything to do with it. These guys just came in. They just did a murder. I don't want to be involved in this. I don't want to do anything. You know, y'all have arrested me. Y'all have taken me to jail, accused me of killing somebody; but I'm going to be quiet about it. I'll tell you what. We'll come up with this whole defense and, you know, use the oldest defense in the world and blame it on the dead guy. And I'm going to spring it on the jury the day of trial." That's just stupid. That's all that is. And that's exactly what they've given you.

Tr. 877.  Defense counsel did not object to the questions or the argument at trial, but Petitioner argued on direct appeal that impeaching his testimony with evidence that he remained silent after receiving <u>Miranda</u> warnings violated <u>Doyle v. Ohio</u>, 96 S.Ct. 2240 (1976).  The defendants in <u>Doyle</u> were silent after given their <u>Miranda</u> warnings, but they took the stand at trial and gave an exculpatory story that they had not previously told the police or prosecutor.  They were cross-examined as to why they had not given the arresting officer the explanations.  The Supreme Court held that it was unconstitutional to allow the arrestees' post-<u>Miranda</u> silence to be used to impeach an explanation later given at trial.

The Supreme Court later decided <u>Jenkins v. Anderson</u>, 100 S.Ct. 2124 (1980).  The defendant turned himself in two weeks after a killing.  He testified at trial and claimed self-defense.  The prosecutor impeached him by asking why he had not reported this to the

police earlier, and the prosecutor referred to the pre-arrest silence in closing arguments. The Court held that this did not violate the Fifth Amendment right to remain silent during his trial because the defendant had voluntarily taken the stand and testified in his own defense. Jenkins distinguished Doyle because, in Jenkins, the failure to speak occurred before the defendant was taken into custody and given Miranda warnings. Thus, due process "prohibits prosecutors from pointing to the fact that a defendant was silent after he heard Miranda warnings [Doyle], but that rule does not apply where a suspect has not received the warnings' implicit promise that any silence will not be used against him. [Jenkins]." Salinas v. Texas, 133 S.Ct. 2174 n. 3 (2013).

The state appellate court discussed Doyle and Jenkins, as well as Louisiana jurisprudence on the issues. It held that it was not reversible for the prosecution to question Petitioner, who took the stand in his own defense, about why Petitioner did not tell the police about Sanders "before his own arrest." The court did not read the State's questions to imply that the prosecution was using Petitioner's post-arrest, post-Miranda silence against him. State v. Grant, 105 So.3d at 88-89.

This claim was adjudicated on the merits in the state court, so habeas relief is available only if the adjudication runs afoul of the highly deferential standards of Section 2254(d). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S.Ct. 770, 786 (2011), quoting Yarborough v. Alvarado, 124 S.Ct. 2140 (2004).

The state court's interpretation of the record was reasonable.  Petitioner contends that he knew when police arrived at his house that Jackie Sanders was the third man involved in the shooting and that he (Petitioner) was innocent.  Petitioner welcomed the police into the house to search but never offered an explanation to them that it was Sanders and not him who had been in the SUV and participated in the shooting.  The state court's application of Doyle and Jenkins was not objectively unreasonable under the circumstances.  A fair-minded jurist could agree with the decision, so habeas relief is foreclosed.  The State makes an alternative argument that any Doyle error is subject to the demanding harmless error standard discussed in Brecht v. Abrahamson, 113 S.Ct. 1710 (1993), but the court need not reach that issue considering the above recommendation.

**Right to Present Witness**

Defense counsel advised the court that he intended to call Alenzia Scott, who would testify that he had a conversation with Jackie Sanders after the shooting and Sanders admitted that he (not Petitioner) had been involved.  Sanders himself could not testify because he had since been murdered.  The State raised a hearsay objection.  Defense counsel invoked L.C.E. art. 801(D)(3)(b), which says a statement is not hearsay if it is offered against a party and the statement is made by a declarant while participating in a conspiracy to commit a crime and in furtherance of the objective of the conspiracy.  The court heard argument and ruled that the statement, apparently made after the shooting, was not "in the right timeframe" and was not in furtherance of the objective of the conspiracy. Alenzia Scott was not allowed to testify.  Tr. 734, 738-39, 743-44, and 831.

Petitioner argued in his post-conviction application that the trial court's ruling violated his right to a fair trial and compulsory process. Tr. 1181-83. The trial court acknowledged the claim, along with several others, and summarily stated that Petitioner failed to meet his burden or produce proper supporting evidence. Tr. 1236. The appellate court did not directly address the claim but held: "On the showing made, the writ is hereby denied." Tr. 1310. The Supreme Court of Louisiana denied a writ application in a *per curium* opinion that stated Petitioner "fails to satisfy the post-conviction burden of proof." Tr. 1342-43.

The Due Process Clause does not guarantee the right to introduce all relevant evidence. "The accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor v. Illinois, 108 S.Ct. 646, 653 (1988). Relevant evidence may be excluded on account of a defendant's failure to comply with procedural requirements, and "any number of familiar and unquestionably constitutional evidentiary rules also authorize the exclusion of relevant evidence." Montana v. Egelhoff, 116 S.Ct. 2013, 2017 (1996). The Court in Egelhoff specifically referenced hearsay rules as prohibiting the introduction of testimony "which, though unquestionably relevant, is deemed insufficiently reliable." Id.

There are rare exceptions, such as Chambers v. Mississippi, 93 S.Ct. 1038 (1973) cited by Petitioner. In Chambers, a state court barred the introduction of evidence that another person confessed to the murder for which the petitioner had been charged. The person who confessed was called, but he repudiated his previous four confessions, and the state court barred the defense attempts to challenge the repudiation with evidence of prior

out-of-court statements. The Supreme Court reversed the conviction, given the critical nature of the evidence and its accompaniment by considerable proof of reliability. The Chambers court did not purport to eliminate hearsay rules, and it stated that it was holding only that this defendant was deprived of a fair trial under "the facts and circumstances of this case." Chambers, 93 S.Ct. at 1049. The Supreme Court observed in Egelhoff that Chambers was "an exercise in highly case-specific error correction." Egelhoff, 116 S.Ct. at 2022. The Fifth Circuit has construed Chambers as standing "for the limited proposition that certain egregious evidentiary errors may be redressed by the due process clause." McCullough v. Cain, 370 Fed. Appx. 443, 447 (5th Cir. 2010), citing Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).

Petitioner no longer argues that the proposed testimony by Alenzia Scott satisfied any exception to the rules of evidence. He argues that due process required that the trial court admit the evidence even though it was hearsay. The proposed testimony does not have either the critical nature or indication of reliability as presented in Chambers. The state courts' decision to reject this claim in the post-conviction process was not an objectively unreasonable application of Chambers or any other clearly established Supreme Court precedent. Relief is not permitted on this claim.

**Confrontation Clause**

William Hall testified for the State and implicated Petitioner. Defense counsel vigorously cross-examined Hall and asked him if he knew Jackie Sanders. Hall responded that Sanders was dead, and Petitioner and Ira Ross "tried to make me say that Jackie Sanders was involved in this." Tr. 778. Counsel questioned why Ira Ross, who had a plea

deal, would be motivated to ask Hall to give that testimony.  Mr. Hall said that Ross had been in a jail with him that day and given him a letter on the issue.  Defense counsel asked to see the letter, and the court asked for a sidebar to determine whether it was admissible. After an unrecorded bench conference, defense counsel (not the prosecutor) asked Hall to read the note.  It stated:

> Bug (Petitioner), Just tell the people the truth.  Let them know I didn't have anything to do with that shit.  I'm supposed to be going to take a deal.  Man, keep it real with me.  Don't let me spend the rest of my life in jail.  Write back, homie.  Duke (Ira Ross)

Counsel asked Hall where Petitioner was implicated in the letter, and Hall admitted that it was "nowhere in there."  Defense counsel then offered the letter into evidence, and it was received as Exhibit D-4.  Tr. 782-83.

Petitioner argues that the State admitted the letter and that it violated his rights under the Confrontation Clause and decisions such as Crawford v. Washington, 124 S.Ct. 1354 (2004).  The state courts summarily rejected this claim on post-conviction.  The record shows that it was not the State that offered the letter, and there is nothing in the letter that implicates Petitioner in the crime or otherwise harms his defense. Accordingly, the state court's denial of this claim was not an objectively unreasonable application of Crawford or any other clearly established federal law.

**Improper Argument by Prosecutor**

Petitioner challenges certain aspects of the prosecution's closing argument.  He argues that ADA Thompson improperly vouched for the credibility of William Hall when he stated:

> Ladies and gentlemen, all that was asked of William Hall was to tell the truth. I don't care what you say, you tell the truth. When William Hall testified, he outlined the motive, which makes all the sense in the world. Like I said, this is not a shooting over dominoes. This is a drug riff, a retaliation for a drug riff.

Tr. 845. ADA Thompson spoke extensively to how the prosecution often must rely on witnesses who are themselves criminals and who have accepted plea bargains. Petitioner challenges as improper his statement that:

> Like I said, we don't cut deals with the shooters. We'll cut a deal with the driver, if we feel that that will completely paint the picture for the jury or seal the case, not only beyond a reasonable doubt, but beyond all doubt. That's what you have here.

Tr. 843. Petitioner argues that Thompson improperly vouched for Hall's credibility when he argued:

> I agree with Mr. William Hall's testimony. Although, like I said, this is an issue for you to decide, I agree with Mr. William Hall's testimony that this is a retaliation shooting.

> Tr. 833.

It is worth noting here that Petitioner was asked, "You do agree that this is a retaliation shooting; is that correct?" Petitioner answered, "Yes, sir." He also agreed that he was a drug dealer. Tr. 827.

ADA Lea Hall handled the rebuttal argument. Petitioner argues that Hall improperly stated that Petitioner and defense counsel were lying when he argued:

> You know, there's this whole thing about when you're defending a case that I love when I watch a criminal defense attorney do it. And that's when they misstate the facts repeatedly that weren't in evidence. Because, you know, I hold onto a belief that the jury is sharp, and they pick up on what is said. But Mr. English repeatedly misstates facts, and he says things that aren't in evidence. And there's a reason that we have evidentiary rules, it's because

stuff that comes in has a certain modicum of trustworthiness. And when a lawyer stands at the podium and says this, that, and the other thing and all this stuff happened and it's not coming to you from sworn testimony, that's not evidence. And the judge is going to so instruct you.

Tr. 866-67. Soon afterward, ADA Hall compared prosecutors to defense attorneys:

In fact, we have ethical responsibilities to make sure that we put before you stuff that we believe is the truth. If we don't have faith in a charge, we can't bring it under law. But let me tell you about the other side of that matter. And he's going to love this. He's going to love this. If Derrick Grant told him, "Yeah, I was it. I was the kingpin. I was dealing all these drugs," and everything that happened was true, do you know what Mr. English is obligated to do? He's obligated to try to get him out of it. It's not the same. What I'm telling you about is self-serving. You couldn't get a better picture of self-serving.

Tr. 867-68.

Defense counsel did not object to any of the closing argument. The court later instructed the jury: "The statements and the arguments made by the attorneys at any time during the trial are not evidence." He explained that evidence was the testimony of witnesses and any documents or exhibits that were introduced into evidence. Tr. 212. Petitioner first raised these claims in his post-conviction application, and the state court summarily denied relief.

Improper jury argument by the state does not provide a basis for habeas relief unless the argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 106 S.Ct. 2464, 2471 (1986). The petitioner must also demonstrate prejudice by showing that the misconduct was so persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction would not

have occurred but for the improper remarks.  Geiger v. Cain, 540 F.3d 303, 308 (5th Cir. 2008); Jones v. Butler, 864 F.2d 348, 356 (5th Cir. 1988).

A prosecutor's vouching for the credibility of witnesses improperly suggests to the jury (1) that evidence not presented at trial but known to the prosecutor supports the charges against the defendant so that the conviction is not based only on evidence presented to the jury, and (2) that the prosecutor's opinion, which carries an imprimatur of the State, should be trusted over the jury's own view of the evidence.  U.S. v. Young, 105 S.Ct. 1038 (1985); Woodfox v. Cain, 609 F.3d 774, 805 (5th Cir. 2010).  "A prosecutor may argue fair inferences from the evidence that a witness has no motive to lie, but cannot express a personal opinion on the credibility of witnesses."  U.S. v. Gracia, 522 F.3d 597, 600 (5th Cir. 2008).

The test for improper vouching for the credibility of a witness is whether the prosecutor's expression might reasonably lead the jury to believe that there is other evidence, unknown or unavailable to the jury, on which the prosecutor was convinced of the accused's guilt.  U.S. v. McCann, 613 F.3rd 486, 495 (5th Cir. 2010).  The comments "are a sufficient ground for habeas relief only if they are so prejudicial that they render the trial fundamentally unfair."  Harris v. Cockrell, 313 F.3d 238, 245 (5th Cir. 2002).  "Such unfairness exists only if the prosecutor's remarks evince either persistent and pronounced misconduct or ... the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred."  Id. at 245.

The prosecutor's comment that he agreed with Mr. Hall that this was a retaliation shooting was consistent with Petitioner's own admission so was harmless.  The statements

about cutting deals were reasonable argument to explain the use of plea bargains and did not improperly vouch for any testimony or cross the line of impropriety. The prosecutor's statements that Mr. English made representations of facts that were not supported by evidence were backed by some specific examples that the prosecutor cited afterwards, and the prosecutor was within his discretion to point out such misrepresentations.

The contention that prosecutors, but not defense attorneys, must follow ethical rules is incorrect and troublesome. ADA Hall's suggestion was that prosecutors are bound to be honest and that defense attorneys are bound to get his client "out of it" and can "say anything I want." That is not the law, and it strikes this court as improper argument. See, e.g., Louisiana Rules of Professional Conduct 3.1 (Meritorious Claims and Contentions) and 3.3 (Candor Toward the Tribunal). Defense counsel's duty of loyalty and to advocate his client's cause is "limited to legitimate, lawful conduct compatible with the very nature of a trial as a search for truth." Nix v. Whiteside, 106 S. Ct. 988, 994 (1986). "Although counsel must take all reasonable lawful means to attain the objectives of the client, counsel is precluded from taking steps or in any way assisting the client in presenting false evidence or otherwise violating the law." Id. The improper argument was, however, only one part of a quite lengthy set of closing arguments. There is little reason to believe, given the overall record, that the verdict would have been different had this argument not been made. Under these circumstances, the state court's rejection of this claim was not an objectively unreasonable application of Darden, Young, or any other clearly established Supreme Court precedent. Habeas relief is not permitted on this claim.

## Denial of Continuance

Attorney Daryl Gold enrolled in January 2004 as retained defense counsel.  Tr. 162.  Attorney Gold obtained a continuance of an October 2004 trial date on the grounds that he had been called for jury duty.  Tr. 193-94.  He obtained a continuance of a December 2005 trial date because it conflicted with a trial he had in federal court.  Tr. 201.001.  A January 2006 trial date was upset, as well as an April 2006 trial date that was continued on the request of Attorney Gold.

The trial was set for June 19, 2006.  Larry English and Carlos Prudhomme enrolled for the defense on June 6, 2006.  Tr. 202.  On the date of trial, attorney Gold filed a motion for continuance on the grounds that he had a jury trial scheduled in another state court.  Tr. 208.  The State represents that the record does not reflect a ruling on this motion, but the trial transcript shows that Petitioner and attorney English appeared in court on June 20, 2006 to commence the trial.  The judge asked Mr. English if he was ready, to which he responded, "Yes, sir, your honor."  The judge asked if anyone had anything that needed to be done before the prospective jurors were brought in, and no issues regarding a continuance or attorney Gold were mentioned.  Tr. 404.  Petitioner argued on post-conviction that the denial of a continuance was arbitrary and that it deprived him of the right to select his own counsel.

Trial judges require a great deal of latitude in scheduling trials.  It is required that they assemble the witnesses, lawyers, and jurors at the same place at the same time, "and this burden counsels against continuances except for compelling reasons."  Morris v. Slappy, 103 S.Ct. 1610, 1616 (1983).  Consequently, broad discretion must be granted trial

courts on matters of continuances. Id. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The court must look to the circumstances present in the case. Ungar v. Sarafite, 84 S.Ct. 841, 850 (1964). "[O]nly an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." Morris, 103 S.Ct. at 1616, quoting Ungar.

With respect to the right to counsel of choice, one element of the Sixth Amendment right to counsel is "the right of a defendant who does not require appointed counsel to choose who will represent him." United States v. Gonzalez-Lopez, 126 S. Ct. 2557, 2561 (2006). A defendant has the "right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." Caplin & Drysdale, Chartered v. United States, 109 S.Ct. 2646, 2652 (1989). If the right is wrongly denied, it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation. Gonzalez-Lopez, 126 S. Ct. at 2564-65.

But the right is not absolute. Gonzalez-Lopez stated that nothing in its decision "casts any doubt or places any qualification upon our previous holdings that limit the right to counsel of choice. . . . We have recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness and against the demands of its calendar. The court has, moreover, an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Id. at 2565-66. The Fifth Circuit applied these

principles in U.S. v. Jones, 733 F.3rd 574 (5th Cir. 2013) and affirmed the denial of a motion to substitute that came 13 days before trial and would have required a continuance of a complicated trial and might have compromised the availability of a key witness.

The state courts summarily denied these claims. The record shows that the trial court granted multiple continuances for attorney Gold, who this court knows had a busy trial practice at that time. The state court, perhaps concerned with the age of the case or speedy trial concerns, did not grant the final request for a continuance. Petitioner appeared with one of his other two retained attorneys and proceeded to trial without any objection at the beginning of the trial or at any time before he filed his post-conviction application. Petitioner has not demonstrated that the state court's denial of these post-conviction claims was an objectively unreasonable application of any Supreme Court precedent governing the granting of continuances or impacting the choice of counsel.

**Ineffective Assistance of Counsel**

### A. Introduction; Burden

Petitioner argues that his attorney rendered ineffective assistance in several ways. To prevail on such a claim, Petitioner must establish both that his counsel's performance fell below an objective standard of reasonableness and that, had counsel performed reasonably, there is a reasonable probability that the result in his case would have been different. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984).

Petitioner's claim was adjudicated and denied on the merits by the state court, so 28 U.S.C. § 2254(d) directs that the question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether the

determination was unreasonable, which is a substantially higher threshold. <u>Schriro v. Landrigan</u>, 127 S.Ct. 1933, 1939 (2007).  The <u>Strickland</u> standard is a general standard, so a state court has even more latitude to reasonably determine that a defendant has not satisfied it.   The federal court's review is thus "doubly deferential."   <u>Knowles v. Mirzayance</u>, 129 S.Ct. 1411, 1420 (2009).

### B.  Jury Instruction on Accomplice Testimony

William Hall pleaded guilty to being involved in the shooting and was an important witness against Petitioner at the trial.  Petitioner argues that defense counsel rendered ineffective assistance because he did not request a special jury instruction regarding the assessment of the testimony of an accomplice.

In Louisiana, a conviction may be sustained on the uncorroborated testimony of an accomplice, although the jury should be instructed to treat such testimony with great caution.  <u>State v. Hollins</u>, 15 So.3d 69, 71 (La. 2009).  A cautionary accomplice instruction is not required if there is material corroboration of the accomplice's testimony.  <u>Id</u>. at 71-72.  An accomplice's testimony is materially corroborated if there is evidence that confirms material points in an accomplice's tale and confirms the defendant's identity and some relationship to the situation.  <u>State v. Hughes</u>, 943 So.2d 1047, 1051 (La. 2006).

Petitioner raised this claim on direct appeal, and the state appellate court addressed it in a reasoned opinion.  The court reviewed the testimony given by Hall and noted that significant aspects of it were corroborated by Mr. Marler, who witnessed the shooting, the testimony of the chasing police officer that the men in the house generally matched the qualities of the men he saw in the SUV, the fresh cut on Petitioner's face that was consistent

with climbing a razor wire fence, and other circumstances.   The court noted that the trial judge had instructed the jury on issues of witness credibility, including an instruction that they consider the witnesses' interest or lack of interest in the outcome of the case, and the extent to which their testimony was supported or contradicted by other evidence.  The jury was also told that the testimony of a witness could be discredited by showing that the witness would benefit in some way by the conviction, or that the witness had any other motive for not telling the truth.   The appellate court concluded that the trial court's instruction provided sufficient guidance for evaluating Hall's testimony, that defense counsel was not ineffective for not requesting an accomplice testimony instruction, and there was no showing of prejudice due to the lack of the instruction.  State v. Grant, 105 So.3d at 91-92.

The state court acted reasonably in denying this claim.  Its assessment of the record points to ample corroborating evidence so that an accomplice instruction was not necessarily required.   The mere absence of a request for a jury instruction does not overcome the strong presumption that counsel made all significant decisions in the exercise of reasonable professional judgment or satisfy a petitioner's burden to show deficient performance.  Thomas v. Vannoy, 651 Fed. Appx. 298, 303 (5th Cir. 2016).  There is also no reason to believe that the verdict might have been different had the court given such an instruction.  Considering the heavy deference due the state court's decision, this claim lacks merit.

### C.  No Experts

Petitioner made several claims of ineffective assistance of counsel under what he labels in his habeas memorandum claims 5, 6, and 7.  Some arguments are repeated multiple times under those headings, but each will be addressed only once in this report and recommendation.  The first argument is that defense counsel were ineffective because they did not obtain a DNA or ballistics expert witness.  Petitioner generally argues that the defense needed a ballistics expert to challenge the conclusions reached by the State's expert.  He argues that a DNA expert could have testified that the lack of blood on the razor wire or a blood trail leading to his house undermined the prosecution's theory that Petitioner suffered the cut above his eye while running from the police.

Petitioner has not identified an expert who could have been called on these issues, nor has he presented any evidence or even allegations concerning what the expert would have stated.  Such "unsupported claims regarding the uncalled expert witness are speculative and disfavored by [the Fifth Circuit] as grounds for demonstrating ineffective assistance of counsel."  Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002).  Petitioner must also be able to show a reasonable probability that, but for counsel not hiring such an expert, the jury would have had a reasonable doubt concerning Petitioner's guilt.  Id.

Petitioner cannot meet his burden based on his mere speculation that there may be a ballistics or DNA expert out there somewhere who might have helped.  Allen v. Stephens, 619 Fed. Appx. 280, 287 (5th Cir. 2015) (no prejudice shown where there was no evidence expert would have testified favorable to the defense).  Petitioner has not articulated any potential testimony from a ballistics or DNA expert that might have changed the outcome

of the trial. The state court's denial of this claim was not an objectively unreasonable application of <u>Strickland</u>.

**D. Evidentiary Issues**

Petitioner argues under the heading of his ineffective assistance claims that the trial court refused to allow the Alenzia Scott testimony. The trial court's ruling on this issue was addressed above. The mere fact that the court refused to allow evidence that defense counsel sought to admit does no render counsel ineffective.

Petitioner also argues that he received ineffective assistance of counsel because the State introduced a letter written by Ira Ross. The substance of the trial court's ruling was addressed above. It was noted there that it was not the State that introduced the letter. It was defense counsel, after consultation with the court, and there was nothing in the letter that implicated Petitioner. The state court's rejection of this claim was not an unreasonable application of <u>Strickland</u>.

**E. No Objection to Closing Argument**

Petitioner argues that defense counsel should have objected to what he believes was improper closing argument by the prosecution. The substance of the improper argument was addressed above. The Fifth Circuit has "recognized that deciding whether to object before a jury is a quintessential matter of trial strategy not to be second-guessed." <u>Thomas v. Thaler</u>, 520 Fed. Appx. 276, 281 (5th Cir. 2013). Many attorneys choose not to object to questionable argument because doing so might draw undue attention to the harmful comments. <u>Id</u>., citing <u>Hernandez v. Thaler</u>, 398 Fed. Appx. 81, 87 (5th Cir. 2010). Considering the leeway that counsel is afforded in such matters, and the unlikelihood of a

different verdict had an objection been made, the state court was not unreasonable to reject this claim.

### F. Rush to Trial

Petitioner has a claim, addressed above, that the trial court erred in denying a requested continuance to allow his original retained attorney, Daryl Gold, to be available for trial. Petitioner appeared for trial with co-counsel Larry English, who announced he was ready to proceed, and no objection was raised by English or Petitioner to proceeding with trial. Petitioner argues that he received ineffective assistance of counsel because he was forced to go to trial with English, who had been enrolled in the case for only 11 days, and not with Gold.

The trial court acted well within its discretion to deny the continuance, as addressed above. The mere fact that English enrolled in the case shortly before trial does not in itself establish ineffective assistance. It may be that English was involved in the case for some time before he filed a formal motion to enroll. Petitioner must be able to point to specific errors or shortcomings in English's performance. He has attempted to do so, and his efforts have been rejected. Petitioner has also raised generic arguments that counsel should have better investigated or prepared for the case, or he should have filed pretrial motions of some kind. Such general assertions are insufficient. "[C]onclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding." Miller v. Johnson, 200 F.3d 274, 282 (5th Cir. 2000). These arguments do not entitle Petitioner to habeas relief from his conviction.

**Jury Instruction**

Petitioner was charged by bill of information with attempted second-degree murder for attempting to murder Michael Parker.  Tr. 12.  Specific intent to kill is an essential element of attempted murder under Louisiana law.  State v. Butler, 322 So.2d 189 (La. 1975).  The Supreme Court has declared unconstitutional any jury instruction that relieves the state of its Fourteenth Amendment burden of proving every element of a criminal offense beyond a reasonable doubt.  In re Winship, 90 S.Ct. 1068 (1970); Sandstrom v. Montana, 99 S.Ct. 2450 (1979).  Petitioner argues that the court's jury instructions on the doctrine of principals improperly relieved the State of its burden of proving specific intent to kill.

The judge told the jury that Petitioner was "charged as a principal with Attempted Second Degree Murder [La. R.S. 14:30.1] by attempting to kill Michael Parker."  He next gave an instruction on principals:

> All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act of constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.

Tr. 213.  He then defined second-degree murder as "the killing of a human being when the offender has a specific intent to kill."  He told the jury that attempt was defined as when a person, "having a specific intent to commit a crime," does or omits an act for the purpose of accomplishing a crime.  Tr. 214.  The judge later gave an instruction that defined specific criminal intent as "that state of mind which exists when the circumstances indicate that the defendant actively desired the prescribed criminal consequences to follow his act or failure

to act." He emphasized: "The crimes of attempted second degree murder and attempted manslaughter require specific criminal intent." Tr. 215.

Petitioner argued on post-conviction that the principals instruction relieved the State of its burden of proving specific intent. The state courts summarily denied relief. The strong deference to the state court decision required by Section 2254(d) "applies even where there has been a summary denial." Cullen v. Pinholster, 131 S.Ct. 1388, 1402 (2011).

Petitioner argues in this court that the jury instructions are similar to those in Robertson v. Cain, 324 F.3d 297, 302 (5th Cir. 2003), a case in which habeas relief was granted. The instruction in this case did not, as did the one in Robertson, tell the jury that it could convict "all persons knowing the unlawful intent of the person committing the crime who were present." That language was not used in this case, and the charge as a whole emphasized repeatedly the requirement that the State prove that Petitioner had specific intent to kill. The state court's adjudication of this issue was not an unreasonable application of any clearly established federal law.

Furthermore, a Sandstrom-type error is subject to a harmless error rule that requires the petitioner demonstrate that the challenged instruction had a "substantial and injurious effect or influence in determining the jury's verdict." Robertson, 324 F.3d at 304-07. The evidence showed that two men armed with centerfire rifles fired at least 20 rounds at three men who were playing dominoes on a porch. There was no evidence or argument to support a conviction for attempted murder on a theory that did not include specific intent

to kill by the two shooters.  The only issue was whether Petitioner was one of the shooters. Under these circumstances, the principal instruction was also harmless.

Petitioner makes a related claim that the bill of information did not specifically charge him as a "principal" to attempted second-degree murder, making his trial fundamentally unfair due to a lack of notice.  Petitioner does not cite any constitutional basis for this claim.  Furthermore, the sufficiency of a state bill of information is not a matter for federal habeas relief unless the charging instrument is so defective that the convicting court had no jurisdiction.  State law is the reference for making that determination, and if the issue is presented to the state's highest court, then consideration of the question is foreclosed in federal habeas proceedings.  McKay v. Collins, 12 F.3d 66, 68-69 (5th Cir. 1994); Morlett v. Lynaugh, 851 F.2d 1521, 1523 (5th Cir. 1988).  Petitioner presented this argument to the state courts in post-conviction, and they found the arguments lacking.  Accordingly, no habeas relief is available on this claim.

**Cumulative Error**

Petitioner's final argument is that the cumulative effect of all the constitutional errors he urges deprived him of a fair trial.  Cumulative error on federal habeas review is a narrow and rare form of due process violation.  Derden v. McNeel, 978 F.2d 1453, 1461 (5th Cir.1992) (en banc).  The petitioner must show, among other things, that individual errors of constitutional dimension (rather than mere violations of state law) so infected the entire trial that the resulting conviction violates due process.  Allen v. Vannoy, 659 Fed. Appx. 792, 818 (5th Cir. 2016). Petitioner's mere repetition of his prior claims, each of which has been rejected on the merits, does not make out a rare case for relief.

Accordingly,

It is recommended that Petitioner's Petition for Writ of Habeas Corpus Relief be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b). Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the

applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 24th day of January, 2019.

Mark L. Hornsby
U.S. Magistrate Judge